MUCKLESHOOT INDIAN TRIBE,
Plaintiff–Appellant,

v.

U.S. FOREST SERVICE; Dennis Bshor, Supervisor, Mt. Baker–Snoqualmie National Forest; Dan Glickman, U.S. Secretary of Agriculture; Bruce Babbitt, U.S. Secretary of the Interior, Defendants–Appellees.

Weyerhaeuser Co., Defendant–Intervenor–Appellee.

Pilchuck Audubon Society; Huckleberry Mountain Protection Society, Plaintiffs–Appellants,

v.

U.S. Forest Service; Dennis Bshor, Supervisor, Mt. Baker–Snoqualmie National Forest; Dan Glickman, U.S. Secretary of Agriculture; United States of America; Bruce Babbit, U.S. Secretary of the Interior, Defendants–Appellees,

and

Weyerhaeuser Co., Defendant–Intervenor–Appellee.

Nos. 98–35043, 98–35231.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1999.

Filed May 19, 1999.

Gregory M. O'Leary, Seattle, Washington, and Robert L. Otsea, Jr., Auburn, Washington, David S. Vogel, Seattle, Washington, for plaintiffs-appellants.

Lisa E. Jones, United States Department of Justice, Washington, D .C., for federal defendants-appellees, United States Forest Service, et al.; Albert Gidari, Michael Himes, Galen G. Schuler, Perkins Coie, Seattle, Washington, for defendant-intervenor-appellee, Weyerhaeuser Company.

Steven C. Moore, Native American Rights Fund, Boulder, Colorado, for amicus curiae National Congress of American Indians.

Before: FLETCHER, REINHARDT and THOMAS, Circuit Judges.

## ORDER

Pursuant to the opinion issued concomitantly with this order, we hereby enjoin any further activities on the land such as would be undertaken pursuant to the Huckleberry Mountain Exchange Agreement as executed by the United States and the Weyerhaeuser Company on March 28, 1997, until such time as the Forest Service satisfies its statutory obligations in a manner consistent with this Court's opinion.

## OPINION

PER CURIAM.

Plaintiffs Muckleshoot Indian Tribe, Pilchuck Audubon Society, and Huckleberry Mountain Protection Society . appeal the district court's grant of summary judgment on consolidated challenges to a land exchange between the United States For-

est Service and Weyerhaeuser Company. Plaintiffs contend that the Forest Service violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. § § 470–470w. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse.

## I. BACKGROUND

Huckleberry Mountain, the land subject to the dispute in this case, is located in the Green River watershed in the Mt. Baker–Snoqualmie National Forest ("the Forest") in the state of Washington. The Forest contains sixteen percent of the wilderness in the Pacific Northwest. Thirteen percent (259,545 acres) of the 1,983,774 acres within the National Forest boundary are privately owned, primarily by Weyerhaeuser and other large corporations. Most of the privately-owned lands are in the southern portion of the Forest, and are intermingled with federal lands in a checkerboard pattern of ownership that remains from the federal land grants to railroads a century ago.

Motivated in large part by a desire to unify land ownership, the United States Forest Service ("the Forest Service") and Weyerhaeuser Company ("Weyerhaeuser") began negotiations for a series of land exchanges pursuant to 43 U.S.C. § 1716, which authorizes the exchange of public lands within the National Forest system where "the public interest will be well served" by the exchange. In the 1980s, the Forest Service negotiated a land exchange with Weyerhaeuser and the Burlington Northern Railroad Company involving lands near Huckleberry Mountain. Under the terms of the Alpine Lakes Exchange, as it became known, the United States conveyed a total of 21,676 acres of federally-owned Forest land to Weyerhaeuser and Burlington Northern in exchange for other property owned by the two companies. In the present appeal, plaintiffs challenge another land exchange between Weyerhaeuser and the Forest Service, the Huckleberry Mountain Exchange ("the Exchange"), in which the Forest Service again traded old growth forest lands in the Huckleberry Mountain area. Many of the parcels conveyed by the Forest Service in the Alpine Lakes Exchange are near or contiguous to federal lands that are part of the Exchange at issue in this appeal.

Although land within the Huckleberry Mountain Exchange Area had been tentatively identified during the Alpine Lakes Exchange negotiations between 1984 and 1987, negotiations began anew in 1988 with a revised list of federal land under consideration for exchange. In July 1991, Weyerhaeuser and the Forest Service signed a Statement of Intent to enter into an exchange, which identified the parcels to be included in the exchange. Between 1992 and 1994, the Forest Service conducted surveys regarding wetlands, wildlife, rare plants, hazardous waste, cultural resources and other matters, and subsequently reduced the federal acreage proposed for transfer.

The Forest Service initiated public consultation and comment and developed a list of six exchange alternatives. In July 1996, the Forest Service released a draft Environmental Impact Statement ("EIS"), pursuant to NEPA, 42 U.S.C. § 4332(2)(C), and mailed over 300 copies to interested parties. It then conducted three open meetings in communities near the Forest. Among those who provided comments on the Draft EIS was the Muckleshoot Indian Tribe (the "Tribe").

On November 26, 1996, the Forest Service issued a final EIS after receiving comments on the draft EIS. The EIS considered three alternatives: a "no action" alternative, and two closely related exchange alternatives.[1] Concurrently, the

---

1. Alternative two proposed an exchange of up to 6,273 acres of Forest Service lands for up to 32,010 acres of Weyerhauser lands. Alter-

native three would remove 1,885 acres from the exchange. That acreage, and an additional 141 acres, would be donated by Weyer-

Forest Service issued a Record of Decision that called for an implementation of the Exchange through a modification of "Alternative No. 3" as evaluated in the EIS.[2]

The Pilchuck Audubon Society and the Huckleberry Mountain Protection Society (collectively "the Societies") and the Tribe lodged separate appeals of the EIS and the ROD with the Office of the Regional Forester. These appeals were denied on March 7, 1997. On March 28, 1997, pursuant to the ROD, Weyerhaeuser and the Forest Service executed an exchange agreement under which Weyerhaeuser conveyed to the United States 30,253 acres of land in and around Mt. Baker National Forest in return for 4,362 acres of land in the Huckleberry Mountain area.[3] In addition, Weyerhaeuser donated to the United States 962 acres to the Alpine Lakes Wilderness and 1,034 acres for Forest Service management. The National Forest lands that Weyerhaeuser received included old growth, commercial grade timber. The Forest Service also exchanged to Weyerhaeuser intact portions of the Huckleberry Divide Trail, a site important to the Tribe and that the Forest Service found eligible for inclusion in the National Register for Historic Preservation. Weyerhaeuser gave the Forest Service lands that were, for the most part, heavily logged and roaded. Weyerhaeuser intends to log the lands it received in the Exchange.

In the spring of 1997, the Tribe and the Societies commenced separate actions in the district court seeking declaratory and injunctive relief to halt the Huckleberry Mountain Exchange. The district court consolidated the two actions and granted Weyerhaeuser's motion to intervene because it was party to the Exchange. The combined action, brought pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701–06, alleged violations of the Federal Lands Policy and Management Act, 43 U.S.C. § 1701 *et seq.*, the General Exchange Act, 16 U.S.C. § 485; the Weeks Act, 16 U.S.C. § 516; the National Forest Management Act, 16 U.S.C. 1600 *et seq.*; NHPA, 16 U.S.C. § 470 *et seq.*, and NEPA, 42 U.S.C. 4321 *et seq.* The Tribe also asserted that the government breached its duty of trust to the Tribe. The district court denied all of these claims.

Plaintiffs appeal only their claims under NHPA and NEPA. The plaintiffs did not seek a stay of the district court's order pending appeal. The Exchange was finalized on March 12, 1998.

 The United States has waived sovereign immunity in this case pursuant to 5 U.S.C. § 702. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because the district court decided the case on a motion for summary judgment, we review that determination de novo. *Neighbors of Cuddy Mountain v. United States Forest Service,* 137 F.3d 1372, 1376 (9th Cir.1998). An agency's factual findings should be "overturned only if they are arbitrary and capricious." *Sierra Club v. Clark,* 756 F.2d 686, 691 (9th Cir.1985).

## II. THE NATIONAL HISTORIC PRESERVATION ACT CLAIMS

The Muckleshoot Tribe is made up principally of descendants of tribes or bands

---

haeuser to the Forest Service contingent on the implementation of that alternative. Nine hundred sixty two acres of the donated parcel would be donated for inclusion in the Alpine Lakes Wilderness Area and 1,034 acres would be proposed for management without timber harvest emphasis. Under that alternative, Weyerhaeuser would also retain title to the subsurface mineral estates on lands transferred to the Forest Service.

**2.** The modifications removed 1,280 acres of federal lands located near the town of Greenwater and 320 acres of federal land around

Mule Springs, an important Tribal site; retained a cost-share status between the Forest Service and Weyerhaeuser for Forest Service Road 7125 to ensure continued tribal access to the site; and modified the terms of the mineral rights that Weyerhaeuser received.

**3.** Weyerhaeuser did not retain title to certain subsurface mineral estates as described in the EIS. Instead, it retained the rights to a portion of the royalties from any minerals leased or sold by the Forest Service on those lands.

that were parties to the Treaty of Point Elliott and the Treaty of Medicine Creek. The Tribe was organized pursuant to the Indian Reorganization Act of June 18, 1934. *See United States v. State of Washington*, 384 F.Supp. 312, 366 (W.D.Wash. 1974). The United States, acting by and through the Secretary of the Interior and his duly authorized delegatees, has consistently recognized the Muckleshoot Tribe as the political successor in interest to certain of the Indian tribes, bands and villages that were parties to the Treaty of Point Elliott or the Treaty of Medicine Creek. *Id.*

The Indian ancestors to the present Muckleshoot Tribe included people from villages on the Green and White Rivers that form part of the drainage for Huckleberry Mountain. The Tribe alleges that for thousands of years, the ancestors of present tribal members used Huckleberry Mountain for cultural, religious, and resource purposes—uses that continue to the present day. The Forest Service lands exchanged to Weyerhaeuser were part of the Tribe's ancestral grounds.

Section 10 of NHPA requires that, prior to any federal undertaking, the relevant federal agency "take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and "afford the Advisory Council on Historic Preservation ... a reasonable opportunity to comment with regard to such undertaking." 16 U.S.C. § 470f; *see also Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1230 (9th Cir. 1999); 36 C.F.R. § 800. The Exchange was such an undertaking. 36 C.F.R. § 800.2(*o*).

We have held that Section 106 of NHPA is a "stop, look, and listen" provision that requires each federal agency to consider the effects of its programs. *See Apache Survival Coalition v. United States*, 21 F.3d 895, 906 (9th Cir.1994). Under NHPA, a federal agency must make a reasonable and good faith effort to identify

historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse, 36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c). The Forest Service must confer with the State Historic Preservation Officer ("SHPO") and seek the approval of the Advisory Council on Historic Preservation ("Council").

Additional NHPA provisions apply to Indian tribes.

(A) Properties of traditional religious and cultural importance to an Indian tribe ... may be determined to be eligible for inclusion in the National Register.

(B) In carrying out its responsibilities under Section 106, a Federal Agency shall consult with any Indian Tribe ... that attaches religious and cultural significance to properties described in Subparagraph (A).

16 U.S.C. § 470a(d)(6).

The Tribe's claims under NHPA can be divided into three categories. The Tribe first contends that the Forest Service failed to consult adequately with it regarding the identification of traditional cultural properties. The Tribe also contends that the Forest Service inadequately mitigated the harmful impact of the exchange on sites of cultural significance. Finally, the Tribe argues that the Forest Service violated NHPA by failing to nominate certain sites to the National Register. We conclude that the Forest Service has not satisfied NHPA's mitigation requirements.

## A. Identification of Traditional Cultural Properties

■ This Court has not yet had the opportunity to interpret the specific con-

sultation requirements of NHPA. The regulations interpreting NHPA require that:

[T]he Agency official, the State Historic Preservation Officer and the [Advisory] Council [on Historic Preservation] should be sensitive to the special concerns of Indian tribes in historic preservation issues, which often extend beyond Indian lands to other historic properties. When an undertaking will affect Indian lands, the Agency Official shall invite the governing body of the responsible tribe to be a consulting party and to concur in any agreement.... When an undertaking may affect properties of historic value to an Indian tribe on non-Indian lands, the consulting parties shall afford such tribe the opportunity to participate as interested persons. Traditional cultural leaders and other Native Americans are considered to be interested person with respect to undertakings that may affect historic properties of significance to such persons.

36 C.F.R. § 800.1(c)(2)(iii).

Although we confront somewhat different issues, *Pueblo of Sandia v. United States*, 50 F.3d 856, 860 (10th Cir.1995) is instructive. The Tenth Circuit concluded that the agency's mailing of form letters soliciting information from knowledgeable parties, combined with an address to the All Indian Pueblo Council requesting the same detailed information solicited by the form letter did not satisfy section 470f. In *Sandia*, the Forest Service did not find any of the properties eligible for inclusion and withheld relevant information from the SHPO during the consultation process. *Id.* at 862. The court found that although none of the tribes provided the information specifically solicited by the letters and presentation, the statements of the Governor of the Sandia Pueblo, a religious leader, and a highly qualified anthropologist, all indicating that the land was sacred, and that the tribes were unlikely to reveal information on the use of these lands, were sufficient to require the agency to evaluate the property for inclusion in the National

Register. *Id.* at 861. The court also determined that the agency had failed to perform the required "good faith consultation" with the State Historic Preservation Office, and reversed the district court order approving the federal action. *Id.* at 862.

In the case before us, the record shows that the Forest Service researched historic sites in the Exchange area and communicated several times after the commencement of the public comment period with Tribal officials regarding the identification and protection of cultural resources that might be affected by the Exchange. The Forest Service initially identified only Mule Springs as eligible for listing in the National Register, and concluded that any adverse effect "may be negated through appropriately conducted data recovery." Two years later, after considering the concerns of the Tribe, the Forest Service excluded Mule Springs from the Exchange and retained the Forest Service access road in a cost-share status. Because this site was excluded from the Exchange, the district court correctly concluded that the Tribe suffered no injury. The Forest Service initially concluded that the Huckleberry Divide Trail ("Divide Trail") was ineligible for listing. After the SHPO suggested otherwise, the Forest Service reconsidered and found it eligible for listing but nonetheless included it in the lands exchanged to Weyerhaeuser. We discuss the Divide Trail in more detail below.

The Tribe also contends that the Forest Service ignored its claims that numerous other places of historical importance were situated on the portions of Huckleberry Mountain proposed for exchange. The Tribe requested a study of its historical places and trails, but in response, the Forest Service, which had already carried out research in the area, simply requested the immediate disclosure of any information the Tribe possessed about those sites. The Tribe was unable, or unwilling, to provide information sufficient to persuade

the Agency that it should reconsider its decisions.

The Forest Service's action is in tension with the recommendations of the *National Register Bulletin 38: Guidelines for Evaluating and Documenting Traditional Cultural Properties* ("Bulletin 38"). Bulletin 38 provides the recognized criteria for the Forest Service's identification and assessment of places of cultural significance. In *Sandia*, the Tenth Circuit's finding that the agency had violated NHPA rested in part upon its finding that the agency failed to adhere to that document. 50 F.3d at 861. The Tribe urges us to find a comparable violation in this case.

■ While the deviations from Bulletin 38 policies in this case are similar to those in *Sandia*, they appear not to be as egregious, and probably do not provide sufficient grounds to conclude that the Forest Service failed to comply with NHPA identification and consultation requirements. First, Bulletin 38 does not impose a mandatory procedure, but merely establishes guidelines. Contravention of those recommendations, standing alone, probably does not constitute a violation of NHPA. Second, in this case, unlike *Sandia*, the Forest Service continued to seek the requested information over a period of time, *cf. Sandia*, 50 F.3d at 861–62, and the Forest Service had previously conducted research of its own to identify relevant traditional cultural properties.

Unlike in *Sandia*, there is no evidence that the Forest Service withheld information from the SHPO pertaining to historic sites, or failed to engage in good faith negotiations with SHPO. *Cf. Sandia*, 50 F.3d at 862. The record shows that the Forest Service resisted the Tribe's requests for a formal study of cultural prop-

erties because it would impede the finalization of the Exchange. Given more time or a more thorough exploration, the Forest Service might have discovered more eligible sites. However, the record also shows that the Tribe had many opportunities to reveal more information to the Forest Service. Although the Forest Service could have been more sensitive to the needs of the Tribe, we are unable to conclude that the Forest Service failed to make a reasonable and good faith effort to identify historic properties.[4] Because we are reversing on other grounds, and because the record shows that the Forest Service's understanding and appreciation of the importance of the Huckleberry Mountain area to the Tribes grew over time, the Forest Service will have an opportunity to re-open its quest for and evaluation of historic sites on Huckleberry Mountain.

### B. The Effects of the Exchange

■ The Tribe also claims that the Forest Service's attempt to mitigate the adverse effect of transferring a portion of the Divide Trail, an important tribal ancestral transportation route, was inadequate. We agree.

When an agency determines that a property is eligible for listing, it must assess the effects of any proposed undertaking on the eligible property, 36 C.F.R. § 800.4(e), "giving consideration to the views ... of interested persons." 36 C.F.R. § 800.5(a). Interested persons include tribes. 36 C.F.R. § 800.1(c)(2).

An undertaking has an "effect" when the undertaking "may alter characteristics of the property that may qualify the property for inclusion in the National Register ... [including] alteration to features of a property's location, setting, or use...." 36

---

4. The conclusions of the Advisory council in response to tribal allegations of procedural inadequacies captures the state of the record on this issue:

Perhaps the Forest Service fell short in involving the Tribe in developing its identification strategy, but the record demon-

strates the [Agency] did make a reasonable and good faith effort to identify historic properties that may be affected by the Hucklebery Land Exchange .... no further effort to identify or evaluate historic properties should be required for this undertaking.

C.F.R. § 800.9(a). An "effect" is "adverse" when it may "diminish the integrity of the property's location, ... setting ..., feeling, or association." 36 C.F.R. § 800.9(b). Examples of "adverse effects" include physical destruction, the introduction of visual, audible, or atmospheric elements that are out of character with the property or alter its setting, and transferring the property. *Id.*

In 1995, the Forest Service re-evaluated the eligibility of the Divide Trail for listing. The Divide Trail is a 17.5 mile historic aboriginal transportation route. The Forest Service found that portions of the trail possessed "adequate integrity of location, setting and feeling" to satisfy the eligibility criteria of 36 C.F.R. § 60.4. In the proposed Exchange, a portion of the intact trail would be transferred to Weyerhaeuser, where it would likely be logged and rendered ineligible for listing. Transfer and destruction of historic property are "adverse" effects. *See* 36 C.F.R. § 800.9(b).

The regulations offer three options to mitigate an otherwise adverse effect so that it is "considered as being not adverse," two of which are implicated here. 36 C.F.R. § 800.9(c). First, an agency may conduct appropriate research "[w]hen the historic property is of value *only for* its potential contribution to archeological, historical, or architectural research, *and* when such value can be substantially preserved through the conduct of appropriate research...." 36 C.F.R. § 800.9(c)(1) (emphasis added). Second, an adverse effect becomes "not adverse" when the undertaking is limited to the "transfer, lease, or sale of a historic property, *and adequate restrictions or conditions are included* to ensure preservation of the property's significant historic features." 36 C.F.R. § 800.9(c)(3) (emphasis added). The Tribe

insists that the Forest Service elected the wrong remedy. We agree.

To mitigate the adverse effect of the Exchange, the Forest Service proposed to map the trail using a global positioning system and to photograph significant features along the trail. It rejected an easement or covenant because it concluded that it was too expensive and impractical to monitor Weyerhaeuser's land practices, and because "only" 25 percent of the eligible miles of trail would be transferred out of federal ownership. It also rejected the imposition of conditions to prevent logging and other degradation. Although the Forest Service purports to have acted under (c)(3), photographing and mapping the trail are not "adequate restrictions or conditions" that "ensure preservation of the property's significant historic features." *See* 36 C.F.R. § 800.9(c)(3).[5] The parties agree that the trail is likely to be logged if it is transferred. The Forest Service has already concluded that previously logged and "obliterated" portions of the trail are ineligible for listing.

The district court determined erroneously that the Forest Service had proceeded under (c)(1) and concluded that the agency acted properly because any adverse effect may be "negated" if the historical and archeological value of the property can be preserved by conducting research on the site. The Forest Service did not, and could not, proceed under (c)(1). Under 36 C.F.R. § 800.9(c)(1), research is appropriate mitigation where the historic property is of value *only* for "its potential contribution to archeological, historical, or architectural research." The Muckleshoots value the Divide Trail for more than its "potential contribution to ... research."

The Forest Service insists that it acted properly, because the SHPO concurred in its proposal to document the trail, provided

**5.** We note that, in proposing this mitigation, the Forest Service claimed that transferring a property "may be determined to have no adverse effect if conditions are included to ensure preservation of the property's *historic*

*values."* (emphasis added). It misunderstands its obligations. Preserving a property's historic values is not the same as preserving its "significant historic features."

that it document the entire intact portion, regardless of ownership, and maintain the portions of the trail not being transferred. These "conditions" do not preserve the trail's significant historic features. Moreover, in 1994, when SHPO first suggested that the Divide Trail probably was eligible for listing, it concluded that

> [i]n view of the unusual nature and remote location of the trail, documentation is probably not an effective mitigative measure. Rather, [SHPO] suggests execution of an easement or covenant attached to the transferring instrument. This easement would provide for the ongoing preservation of the Divide Trail and its setting after the land has been transferred.

While we do not decide whether the Forest Service's reasons for rejecting deed restrictions were valid, we note that it could have removed the trail from the Exchange as it did with Mule Springs. We conclude that documenting the trail did not satisfy the Forest Service's obligations to minimize the adverse effect of transferring the intact portions of the trail.

### C. Nomination of Historic Sites

Finally, the Tribe contends that the Forest Service violated the Preservation Act by failing to properly nominate the Divide Trail to the National Register. In light of our ruling, we need not address this issue. Upon remand, the Forest Service may wish to reconsider its treatment of the historic properties in the Exchange lands.

### III. NATIONAL ENVIRONMENTAL POLICY ACT CLAIMS

NEPA requires federal agencies such as the Forest Service to prepare a detailed environmental impact statement ("EIS") for "all major actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). An EIS must address the cumulative impacts of a project and consider adequate alternatives.

In evaluating whether an agency's EIS complies with NEPA's requirements, we must determine whether it contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences." *Neighbors of Cuddy Mountain*, 137 F.3d at 1376. We review for an abuse of discretion. *Id.*

The plaintiffs have raised several different claims under NEPA. The Tribe contends that the identification and analysis of cumulative environmental impacts in the Forest Service's EIS did not meet the requirements of NEPA. The Societies contend that the EIS inadequately defined the purpose and need for the Huckleberry Land Exchange as required by NEPA, and did not identify or evaluate sufficient alternatives for the exchange. We consider each of these issues in turn.

### A. Assessment of Cumulative Impacts under NEPA

We first address the Tribe's contention that the Forest Service failed to consider the cumulative impact of the exchange. A cumulative impact is defined as:

> [T]he impact on the environment which results from the incremental impact of the action when added to other past, present and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Regulations implementing NEPA require that a federal agency consider "[c]umulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2).

In *City of Carmel–By–The–Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142 (9th Cir.1997), we noted that an EIS must "cat-

alogue adequately the relevant past projects in the area." *Id.* at 1160. It must also include a "useful analysis of the cumulative impacts of past, present and future projects." *Id.* This requires "discussion of how [future] projects together with the proposed . . . project will affect [the environment]." *Id.* The EIS must analyze the combined effects of the actions in sufficient detail to be "useful to the decisionmaker in deciding whether, or how, to alter the program to lessen cumulative impacts." *Id.* at 1160 (internal citations omitted). Detail is therefore required in describing the cumulative effects of a proposed action with other proposed actions. *Neighbors of Cuddy Mountain,* 137 F.3d at 1379; *see also Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214–15 (9th Cir.1998).

The Tribe contends that the EIS gives inadequate consideration to the cumulative impacts of logging on the 1984 Alpine Lakes Exchange lands, of existing logging and other disturbances in the Green River watershed, and of a future land exchange with the Plum Creek Timber Company that involves lands in the same vicinity as the Huckleberry Mountain Exchange. The district court held that the Forest Service did not need to consider the 1984 Alpine Lake Exchange because it was part of the baseline environment and, as such, was considered in the EIS for the Mt. Baker Snoqualmie National Forest Land and Resource Management Plan, as amended by the 1994 Northwest Forest Plan ("LRMP"). The district court also held that the Plum Creek exchange was "too uncertain" to require a discussion of cumulative effects. We do not agree with those conclusions.

Appellees urge that because the final EIS for the Huckleberry Exchange is tiered to the LRMP, it sufficiently analyzes the cumulative impacts of the Exchange.

"Tiering" is defined as:

[T]he coverage of general matters in broader environmental impact statements (such as national program or poli-cy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

40 C.F.R. § 1508.28; *see also* 40 C.F.R. § 1502.20.

■ We have previously interpreted the regulations to allow tiering only to another environmental impact statement. *Blue Mountains Biodiversity Project,* 161 F.3d at 1214; *see also* 40 C.F.R. § 1508.28. The Huckleberry Exchange EIS is tiered erroneously to the Forest Plan, not the EIS for the Forest Plan. Our review of the Forest Plan and its accompanying EIS reveals that those documents do not account for the specific impacts of the Exchange and do not remedy the Forest Service's failure to account for the impacts of the Exchange in the Huckleberry Exchange EIS. *See e.g., Resources Ltd. v. Robertson,* 35 F.3d 1300, 1306 (9th Cir. 1993) ("specific analysis is better done when a specific development action is to be taken, not at the programmatic level.").

The LRMP EIS, prepared in 1990, was prepared before the Huckleberry Exchange lands were identified with any certainty. The concept of the Huckleberry exchange was mentioned only in a pool of possible projects that would help meet the goals of the Forest Plan. There was no detail concerning those projects and their impacts. The proposed Exchange simply was not concrete enough to allow for adequate analysis. Moreover, the LRMP EIS did not analyze the impact of increased logging on the parcels that had been transferred out of federal ownership in the 1984 Alpine Lakes Exchange. Many of those parcels are in the same vicinity as the old growth forest lands the Forest Service transferred to Weyerhaeuser. If we were to adopt the Forest Service's approach, the

cumulative impacts of land exchanges would escape environmental review.

The problem is compounded by the very general and one-sided analysis of the cumulative impact information that the Huckleberry Exchange EIS does contain. While the district court was correct in observing that there are "twelve sections entitled 'cumulative effects,'" these sections merely provide very broad and general statements devoid of specific, reasoned conclusions.

For example, the cumulative impact statement regarding the impact of alternatives two and three on natural vegetation simply indicates the amount of land to be exchanged, and whether or not the land will be subject to commercial harvest. It then concludes:

> Under Alternatives two and three, the Forest Service would manage for non-harvest uses an additional 16,735 (16,876 under Alternative 3) acres of young forest and non-forest vegetation. Most of this acreage ... would over time develop greater species diversity and stand structure.

The statement notably contains no evaluation whatsoever of the impact on natural resources of timber harvesting on the lands transferred to Weyerhaeuser, nor does it assess the possible impacts that such harvesting could have upon surrounding areas. The statement focuses solely on the beneficial impact the exchange will have on lands received by the Forest Service. All of those described benefits are contingent on appropriate Forest Service action and funds to promote the recovery of the harvested lands that it will acquire. This lopsided analysis is repeated in virtually every cumulative impact statement throughout the EIS.

We hold that the cumulative impact statements that are provided in the EIS are far too general and one-sided to meet the NEPA requirements. *See Neighbors of Cuddy Mountain* 137 F.3d at 1379. The statements fall far short of a "useful

analysis" as required by *City of Carmel*, 123 F.3d at 1160. *See also Blue Mountains Biodiversity Project*, 161 F.3d at 1214–15.

The appellees also attempt to tier the Exchange EIS to the Green River Watershed Report to cure the deficiencies of the cumulative impact analysis of the Exchange EIS. Such reliance is impermissible under the NEPA regulations, which only permit tiering to prior EIS's. 40 C.F.R. §§ 1502.20 and 1508.28.

The analysis in the Green River Watershed Report, even if appropriately allowed as a tiering document, demonstrates the need for a more thorough cumulative impact analysis. The Green River Watershed Report explicitly states that the watershed area was degraded by logging prior to the Huckleberry exchange. The Report cautions that future exchanges should be sensitive to the need to avoid additional environmental degradation. Moreover, the Report covers only a portion of the area affected by the Exchange. The Huckleberry EIS should have analyzed the cumulative effects of the logging incident to this exchange upon that damaged watershed area in conjunction with the other degradation mentioned in that document. 40 C.F.R. § 1508.7; *see also Neighbors of Cuddy Mountain*, 137 F.3d at 1378. The EIS performs no such analysis. It fails to evaluate the near term impacts of Weyerhaeuser's logging of old growth timber in any meaningful fashion. Therefore, even if the Exchange EIS could be tiered to the Watershed Report, the Watershed Report is only the starting point for the required analysis. It does not fill the gaps in the Exchange EIS.

Plaintiffs also contend that the EIS failed to analyze adequately the cumulative effects of a future land exchange involving Plum Creek Timber Company that, according to plaintiffs, was "reasonably foreseeable" at the time the Exchange EIS was prepared. An agency must analyze the incremental impact of the action "when added to other past, present, and *reason-*

*ably foreseeable* future actions. . . ." 40 C.F.R. § 1508.7 (emphasis added). The district court determined that the Plum Creek Exchange was too speculative to require analysis.

Our review of the record suggests that the Plum Creek transaction was not remote or highly speculative. Rather, it was reasonably foreseeable and it should have been considered in the EIS. A summary of the proposed Plum Creek transaction already had been prepared by the Forest Service by 1995. On June 27, 1996, five months before the Huckleberry EIS was issued, Secretary of Agriculture Dan Glickman formally announced the proposed Plum Creek Exchange to the public. USDA Press Release (June 27, 1996), at 1.

Moreover, the record reflects that the Forest Service was all but certain that the National Forest lands in the upper Green River Basin would be included in the Plum Creek exchange. The Huckleberry Exchange EIS was issued in November 1996. In July 1996, the Green River Watershed plan described the Plum Creek exchange, and in January 1997, two months after the Huckleberry Exchange EIS issued, a revised map showing lands to be exchanged in the Plum Creek Exchange was published. The Plum Creek Exchange was not too speculative in November, 1996, to be analyzed in the Huckleberry Exchange EIS.

Given the virtual certainty of the transaction and its scope, the Forest Service was required under NEPA to evaluate the cumulative impacts of the Plum Creek transaction. *See La Flamme v. Federal Energy Regulatory Comm'n*, 852 F.2d 389, 401 (9th Cir.1988); *Neighbors of Cuddy Mountain*, 137 F.3d at 1379. In the absence of an EIS that takes into consideration the cumulative effects of the planned land sales and resultant environmental impacts, we cannot conclude that the Forest Service took the necessary "hard look" at the cumulative environmental impacts of the Huckleberry Exchange. *See Blue Mountain*, 161 F.3d at 1216.

Nor can the Forest Service's inappropriate use of tiering meet the requirements of the NEPA. While the LRMP EIS, which was completed in 1990, does mention the Plum Creek Exchange, it expressly indicates that at that time, its effects were too speculative to gauge. The tiering of documents that do not perform the required cumulative impact analysis falls far short of the standard articulated in *Neighbors of Cuddy Mountain*. In 1996, when the Huckleberry Exchange EIS was completed, the Plum Creek Exchange had moved well beyond mere speculation. The Forest Service abused its discretion in ignoring the impacts of that exchange.

## B. Failure to Consider an Adequate Range of Alternatives

 We also agree with the Societies' contention that the Forest Service violated NEPA by failing to consider a range of appropriate alternatives to the proposed exchange.

The Societies first contend that the EIS fails to properly specify the underlying purpose and need to which the proposal is responding as required by NEPA regulations. *See* 40 C.F.R. § 1502 .13 (requiring a statement that "shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action").

The EIS states that the purpose and need for the proposal is to "consolidate ownership and enhance future resource conservation and management by exchanging parcels of National Forest System and Weyerhaeuser land." The Societies argue that this narrowly stated purpose fails to meet the requirements of section 1502.13 as it was interpreted in *City of Carmel*, where we held that "[t]he stated goal of a project necessarily dictates the range of reasonable alternatives and an agency cannot define its objectives in unreasonably narrow terms." 123 F.3d at 1155.

While the statement of purpose contained in the EIS, taken in complete iso-

lation, would appear too narrow to meet the standards articulated in *City of Carmel*, we note that the EIS expressly incorporates it within the LRMP's stated purpose of "creat[ing] consolidated land ownership patterns where consistent management mandates, policies and objectives apply across large blocks of land." Because the EIS' statement of purpose makes clear that an exchange of land with Weyerhaeuser would foster the desirable consolidation of ownership of the checkerboard land holdings, it is reasonable and should be upheld. *See Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C.Cir.), *cert. denied*, 502 U.S. 994, 112 S.Ct. 616, 116 L.Ed.2d 638 (1991) (holding that agency's stated objective should be upheld where reasonable).

However, in the course of evaluating the options that would best achieve the stated purpose of the proposed action, the Forest Service failed to consider an adequate range of alternatives. The EIS considered only a no action alternative along with two virtually identical alternatives. The selected alternative, Alternative 3, differed from Alternative 2 only in that it re-labeled a portion of the lands Weyerhaeuser transferred to the Forest Service a donation rather than an exchange, and added 141 acres of donated land.

In addressing the claims that the Forest Service erred in failing to mitigate the possible harms of the exchange, the district court concluded that there was no evidence that Weyerhaeuser would agree to plaintiffs' proposed alternative of the Forest Service purchasing the Weyerhaeuser land rather than exchanging for it and that there was no evidence that the agency failed to consider, as required by *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1305 (9th Cir.1994), "a reasonably full range of alternatives."

Our review of the record, reinforced by the statements of Weyerhaeuser's counsel at oral argument, compel us to reach the opposite conclusion. In this case, the Forest Service, after a process of "scoping" to collect the views of the public, initially considered five action alternatives and a no action alternative for the project. Three alternatives were eliminated from detailed study. Analyses were performed on the remaining two proposals and the no action plan.

One of the alternatives that was preliminarily eliminated from detailed study would have placed deed restrictions on the land traded to Weyerhaeuser, requiring that the lands be managed under National Forest Service standards, rather than allowing Weyerhaeuser to log the land pursuant to the less stringent standards of Washington state law. That alternative was rejected on the grounds that it would decrease Weyerhaeuser's incentive to trade. However, there is nothing in the record to demonstrate that the Forest Service even considered increasing Weyerhaeuser's incentive to trade either by offering additional acreage, subject to deed restrictions, or by decreasing the amount of Weyerhaeuser land transferred in the Exchange.[6]

Although NEPA does not require the Forest Service to "consider every possible alternative to a proposed action, nor must it consider alternatives that are unlikely to be implemented or those inconsistent with its basic policy objectives," *Seattle Audubon Society v. Moseley*, 80 F.3d 1401, 1404 (9th Cir.1996), we are troubled that in this case, the Forest Service failed to consider an alternative that was more consistent with its basic policy objectives than the alternatives that were the subject of final consideration. In this case, the applicable regulation controlling implementation of the Federal Land Policy

6. We also note that NHPA regulations suggest that when federal land with historic properties is sold or transferred, this "adverse effect" becomes "not adverse" if adequate restrictions or conditions are included to preserve the property's significant historic features. *See* 36 C.F.R. § 800.9(c)(3).

Management Act, 43 U.S.C. § 1701 *et seq.*, pursuant to which the Exchange was transacted, dictates that the agency officer authorized to conduct a land exchange "shall reserve such rights or retain such interests as are needed to protect the public interest or shall otherwise restrict the use of Federal lands to be exchanged, as appropriate." 36 C.F.R. 254.3(h). A detailed consideration of a trade involving deed restrictions or other modifications to the acreage involved is in the public interest and should have been considered.

We also recognize that an agency's discussion of alternatives must be "bounded by some notion of feasibility." *See Vermont Yankee Nuclear Power v. NRDC*, 435 U.S. 519, 551, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978). Counsel for Weyerhaeuser conceded at oral argument that the imposition of deed restrictions was a viable alternative to the Exchange Agreement of March 28, 1997. A "viable but unexamined alternative renders [the] environmental impact statement inadequate." *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir.1985). Imposition of deed restrictions was a feasible alternative that could not be ignored.

The plaintiffs also argue that the land could have been purchased outright with funds from the Federal Land and Water Conservation Fund. While the Forest Service itself cannot appropriate these funds, it can request them. The record reflects that such a request was never made, and indeed, this option was not even considered.

The appellees respond that, because it was not clear that the funds would be available for such a purchase, the Forest Service had no obligation to consider it, as it constituted a "remote and speculative" alternative. *Vermont Yankee*, 435 U.S. at 551, 98 S.Ct. 1197. However, NEPA regulations state that agencies shall "include reasonable alternatives not within the jurisdiction of the lead agency." 40 C.F.R. § 1502.14(c). This alternative clearly falls within the range of such reasonable alternatives, and should have been considered. We also note that in presenting the beneficial cumulative impacts of the exchange, the EIS frequently relies upon references to admittedly speculative funds that will be used by the Forest Service in restoring the forest lands that it gains through the transaction. We are troubled by this selective willingness to rely upon the availability of funding sources beyond the Forest Service's direct control.

The Forest Service also contends that because the purpose of the transaction was to carry out an "exchange" and not a purchase, it was not required to consider this alternative. *Seattle Audubon Society*, 80 F.3d at 1404 (holding that an agency is not required to examine alternatives inconsistent with its basic policy objectives). To the extent that Weyerhaeuser would have been exchanging its lands for federal monies rather than federal lands, we do not recognize such an inconsistency.[7]

NEPA "does not mandate particular results," but "simply provides the necessary process" to ensure that federal agencies take a "hard look" at the environmental consequences of their actions. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989). We conclude that in this case, the Forest Service failed to take the necessary hard look at the environmental impacts of the exchange and similarly failed to consider adequate alternatives to the proposed exchange.

## IV. MOOTNESS

In this case, Weyerhaeuser (but not the United States) has contended that the appeal is moot because on March 12, 1998, the United States and Weyerhaeuser completed the Exchange through the con-

---

7. Were we to construe the statement of purpose as limiting the transaction to land-for-land exchanges, it would certainly be too nar-

row to meet the standards for an appropriate statement of purpose as articulated in *City of Carmel*, 123 F.3d at 1155.

veyance of patents and deeds and Weyerhaeuser has secured permits to log from the State of Washington. The plaintiffs failed to obtain a stay of the district court's order pending appeal, and Weyerhaeuser now alleges that it owns and conducts business operations on the land obtained from the United States, and has assumed the obligation, pursuant to the exchange agreement, of managing over 7,500 acres of its non-Exchange lands. According to Weyerhaeuser's counsel at oral argument, Weyerhaeuser has already "destroyed" at least ten percent of the land it obtained through the exchange.

 Conveyance of property to another does not moot a case. *National Forest Preservation Group v. Butz,* 485 F.2d 408, 411 (9th Cir.1973). Federal courts are authorized to "void a property transaction" where necessary. *National Wildlife Federation v. Espy,* 45 F.3d 1337, 1342 (9th Cir.1995). Where the actions involved in a title transfer can be undone, this court will not find meritorious the defense of mootness. *Burbank Anti–Noise Group v. Goldschmidt,* 623 F.2d 115, (9th Cir.) *cert. denied,* 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

Given our reluctance to invoke the doctrine of mootness, the facts that the exchange has occurred and that Weyerhaeuser has begun to log pursuant to its state permits do not meet the "heavy" evidentiary burden that a party must carry in order to establish mootness. *See County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). The only evidence properly before us simply illustrates that the property transfer has occurred. This evidence is insufficient to establish mootness. *National Forest Preservation Group,* 485 F.2d at 411; *National Wildlife Federation,* 45 F.3d at 1342. The fact that Weyerhaeuser may have "destroyed" a portion of the land does not alter the ability of the government to accept a reassignment of the property, if required.

## V. CONCLUSION

We hold that the Forest Service failed to meet the requirements of NHPA and NEPA. Its attempt to mitigate the adverse effect of transferring portions of the Divide Trail by documenting the trail did not comport with the regulations. It did not adequately consider the cumulative impacts of the Huckleberry Exchange in conjunction with past or reasonably certain future transactions. To the extent it attempted an analysis of cumulative impacts, the analysis was one-sided. Finally, it did not consider adequate alternatives to implement the Exchange.

In light of our ruling, we need not reach the questions of whether the district court properly excluded evidence or whether the Forest Service was required to nominate the Divide Trail. Our remand allows the Forest Service to reconsider whether it has located all of the historic properties on the lands it proposes to transfer out of federal ownership and what protections should be required.

We REVERSE and REMAND to the district court with directions that it remand to the Forest Service for further proceedings consistent with this opinion. Given Weyerhaeuser's representations that it has destroyed approximately ten percent of the property, and will continue to do so, we also enjoin any further activities on the land such as would be undertaken pursuant to the Huckleberry Mountain Exchange Agreement as executed on March 28, 1997 until such time as the Forest Service satisfies its NHPA and NEPA obligations. The injunction shall take effect immediately by virtue of a separate order filed concomitantly with this opinion.